614 A.2d 273

**AETNA CASUALTY & SURETY COMPANY, Appellee,**

v.

**Rosezene DAVIS and Clarence Cohen, Jr..**

**Appeal of Rosezene DAVIS.**

Superior Court of Pennsylvania.

Argued May 28, 1992.

Filed Sept. 3, 1992.

Andrew K. Fine, Philadelphia, for appellant (submitted).

Michele D. Carter, Philadelphia, for appellees Aetna and Davis.

Before CIRILLO, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge.

This is an appeal from the October 1, 1991, order granting summary judgment in favor of appellee Aetna Casualty & Surety Company ("Aetna"). We reverse.

Most recently, this Court re-stated the standard of review with regard to an order granting summary judgment; to-wit:

Summary judgment may properly be entered only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.Civ.P. 1035(b).

The moving party has the burden of persuading the court that no genuine issues exist as to the material facts. Summary judgment may be entered only where the case is free from doubt. In passing upon a motion for summary judgment, moreover, a court must examine the record in the light most favorable to the non-moving party. Any doubt must be resolved against the moving party.

We will overturn a trial court's entry of summary judgment only if there has been an error of law or clear abuse of discretion.

*Allen v. Merriweather,* 413 Pa.Super. 410, 605 A.2d 424, 425 (1992) (citations omitted). With these precepts in mind, we will examine whether the summary judgment was entered properly.

On February 2, 1990, Aetna filed an action for declaratory judgment pursuant to 42 Pa.C.S.A. § 7531 et seq. to determine whether liability/indemnification coverage was due its insured, Clarence Cohen, Jr.

Aetna had issued Cohen an automobile liability policy covering his van. The policy did not provide uninsured motorist coverage for bodily injury sustained by "any person" while occupying the covered vehicle when it was "used to carry persons or property for a fee."[1]

It was Aetna's position that the carry-for-a-fee clause excused it from paying Rosezene Davis' claim for bodily injuries sustained while a passenger in Cohen's van. Allegedly, Cohen "had been transporting a refrigerator for a fee within his vehicle when the incident [resulting in Davis' injuries] occurred." Therefore, it urged the exclusion clause, with respect to the uninsured motorist coverage section of the policy, rendered unavailable uninsured motorist coverage to Davis since she was a person seeking uninsured motorist coverage while occupying a covered automobile when it was used to carry property for a fee. Paragraph 19.

In answer, Davis denied that Cohen was transporting a refrigerator for a fee or that a third party paid Davis to accompany Cohen in his delivery of a refrigerator. Similarly, Cohen's response to the action for declaratory judgment denied being hired by either Davis or a third party to transport a refrigerator for a fee of $15.00.

Thereafter, Aetna filed a motion for summary judgment wherein it was asserted that because Cohen's policy excluded uninsured motorist coverage when the vehicle carried person or property for a fee, Davis' presence in his van for the purpose of being transported along with the other property for a fee "operate[d] to exclude any liability indemnification and/or Uninsured Motorist Coverage to ... Davis arising from the incident." To buttress its contention that Cohen received remuneration for transporting a refrigerator while

---

1. The clause in question reads in relevant part:
   EXCLUSIONS
   A. We do not provide Uninsured ... Motorist coverage for bodily injury sustained by any person:
   1. ...
   2. While occupying your covered auto when it is being used to carry persons or property for a fee. This exclusion does not apply to the share-the-expense car pool.

Davis was a passenger in his van, deposition testimony was attached revealing that Cohen had purchased a van. He was approached by a friend (Charles Butt) to do him a favor, i.e., transport Butt, his lady friend and a refrigerator she intended to purchase. Butt's lady friend asked Ms. Davis to accompany them "to show her where to get the ice box", for which Davis was paid $5.00 by the lady friend.

After Ms. Davis was "dropped off", Cohen took his friend, the refrigerator and its owner to their destination. Once there, the friend of the lady/owner of the refrigerator removed it from the van, and, according to the exchange between counsel and Cohen, money was paid at that time; namely:

Q. When you got there, and you dropped off the refrigerator, and it was taken out of the van by the friend, what happened after that? Did you receive some money by the friend of that person who took the refrigerator out?

A. He gave me $15.

Q. The friend of the person who owned the refrigerator gave you $15 after the refrigerator was taken out of the van?

A. When the refrigerator was taken out of the van, the friend to this lady, that was Rosezene Davis' friend, he gave me $15.

Q. Did he give you anything else, other than $15? Were any pieces of paper or documents generated?

A. No. *He just told me that he appreciated that I had helped his lady out.*

Exhibit "G", page 26 (Emphasis added).

It would appear that Davis was injured in a one-vehicle accident while a passenger en route to deliver a refrigerator for her lady friend/purchaser, i.e., after the refrigerator had been picked up, the accident occurred and Davis was dropped off thereafter but before the refrigerator reached its ultimate destination and Cohen was paid.

From a review of the remaining transcript excerpts, it would appear that Cohen's transportation excursion was "something out of the clear blue sky", and it was done as a

"favor" for a "friend". Although compensation was to be made, Cohen wanted it "to buy [his] gas or something." Exhibit "G", page 23. Yet, the fortuitous nature of Cohen being paid is evident from the fact that he took on the task of transporting people and refrigerator without any *assurance* that payment would be forthcoming with the completion of the delivery; to-wit:

Q. You drove it home and ran into Charles Butt. Then he asked, "Could you help me out moving a refrigerator for somebody?"

A. That is how it happened.

Q. When you had the conversation with Charles Butt about moving the refrigerator, what specifically did you talk about? What did you agree to do?

A. I talked with him. We had to go get the refrigerator, and I brought it back down there for this lady. When we get there, we put the refrigerator on my truck and from Frankford Avenue, we took it down to 5th Street and Washington Avenue in an apartment house down there. When I got there, they were giving me $15.

Q. *When you got there someone gave you $15?*

A. *Yes. The guy who was down there.*

Q. *Who was this guy you are talking about?*

A. *I don't know. It was supposed to have been a friend of these people.*

Q. *When you first spoke to Charles Butt, when you got back to your house with the new van, did you talk to him about receiving money to move the refrigerator?*

A. *I asked him if these people—did they have any money.*

Q. What did he say?

A. *He said he did not know at the time.*

Q. *Did you ask him specifically whether they were willing to pay you $15 to move the refrigerator for any other amount?*

A. *No. I did not ask him specifically.*

Q. But you did ask him about whether they had money to pay to move the refrigerator?

A. *I asked him if they was [sic] willing to compensate me for some kind of gas money—to pay for the gas.*

Q. How much gas did you end up using driving the refrigerator around that day?

A. Well, I cannot say. I just put whatever I figured I needed in there—$5.00, $6.00, whatever.

Q. You talked to Charles Butt. You mentioned the idea of getting some kind of compensation. Then what happened? You went in your van and drove to Frankford Avenue?

A. Yes.

\*        \*        \*        \*        \*        \*

Q. Have you ever used your van for moving someone else's stuff for any kind of charge?

A. No.

Q. That was the only time you did that?

A. Mister, my van was bought for recycling.

Q. You never moved anybody else's stuff for a charge?

A. No, sir. I would not do that because it is too much work for me, for too little. . . .

\*        \*        \*        \*        \*        \*

[Q.] Charles Butt when you first ran into him after getting the van. Did you talk about compensation for giving people a ride, as well?

A. No. I am not going into that. The truck was bought for recycling purposes, and this thing happened out of the clear blue sky—*doing a friend a favor. Otherwise, I do not do that.*

Q. You went to 16th and Christian Streets and dropped off Rosezene Davis?

A. Right.

Q. When you dropped her off, were you paid any compensation?

A. No, sir.

Q. Were you ever given $5.00 from anyone for the purpose of giving Rosezene Davis a ride?

A. Rosezene Davis was given $5.00 from the other lady to go with her—to accompany her. This is where the $5.00 came in.

Q. You are saying that the person who owned the refrigerator paid Rosezene Davis?

A. Paid Rosezene $5.00 to accompany her, to go with her to show her where to get the ice box....

See Exhibits "B", "C", "D" & "E", pages 17, 18, 24 & 36 attached to Trial Court Opinion dated 11/27/91 (Emphasis added).

Instantly, we have an individual agreeing to transport an item and individuals to a set destination for a friend. Although he asked to be compensated for the *gas* to be consumed, he took on the delivery *without any guarantee or discussion as to payment or the amount of remuneration.* No condition precedent or subsequent was testified to before delivery of the refrigerator could occur. In fact, Cohen's friend could tell him no more than "he did not know at the time ... if these people ... ha[d] any money" to pay him. Thus, Cohen embarked on a course of action without any advance knowledge of whether he would be compensated for agreeing to transport equipment and people.

With the close of the pleadings, the court below entered its order finding in favor of Aetna in the belief that Cohen's actions came within the "carrying persons or property for a fee" exclusion of Aetna's policy so as to preclude Davis from recovering under the uninsured motorist provision of Cohen's policy. This appeal was taken by Davis.

We begin our inquiry with the admission that the case law in this jurisdiction is sparse and vintaged on the enforceability of a "carrying for fee" exclusion in insurance contracts. Accordingly, we have looked to other jurisdictions and the federal courts to supplement our research.

In *Rykill v. Franklin Fire Ins. Co.,* 80 Pa.Super. 492 (1923), an insured filed three claims with his insurer. Two of the three accidents occurred after the insured had applied for and

received a "Jitney Automobile" permit which gave him a license to carry passengers for hire.

The insurer defended at trial on the basis of stipulations that caused the policy to "cease and terminate ... if the automobile ... be used for carrying passengers for compensation or be rented or hired ... for consideration ... No exceptions." Preceding two of the accidents, the automobile had been used to carry passengers for hire.

The trial court adopted the view that unless the automobile was being used for a prohibited use at the time of the accident, it was not a defense against the claim. We disagreed and caused judgment to be entered in favor of the insurer notwithstanding the verdict for the insured.[2] In doing so, we wrote:

> The learned trial judge ... held that unless the automobile was being used for a prohibited use at the time the accident took place, it was not a defense against the claim. With this conclusion, we do not agree. Such a view defeats wholly the manifest purpose of the stipulation and does violence to its terms. The provision is a reasonable one. It was the privilege of the company to decline to enter into this contract unless the insured agreed that the car would not be used at any time to carry passengers for compensation. It is a matter of common knowledge that the premium rate of insurance upon automobiles used for commercial purposes is higher than on cars used for pleasure. The obvious reason for this is the increased hazard. The rate charged is based upon the terms of the contract. No reason is advanced for disregarding the contract.

> \*     \*     \*     \*     \*     \*

> In the case at bar, the use of the automobile for carrying passengers for hire is prohibited in terms. The insured must be held to have known that his contract terminated if he violated its conditions. *Nor is this case of the violation*

2. The third vehicular accident reported, although occurring before the insured acquired his "Jitney license", was found to have been based on insufficient evidence and warranted reversal in favor of the insurer as well.

*of the terms in one instance only. The evidence shows that the use of the car for the prohibited purpose was habitual rather than exceptional.* It is not straining a point to hold that the use rendered the policy void.

80 Pa.Super. at 493–94, 495 (Emphasis added); cf. *Murphy & Co. v. MFG's Cas. Co.,* 89 Pa.Super. 281 (1926) (Automobile used by insured to carry material to his workmen did not fall within exclusion clause's prohibition against use for "commercial delivery"; clause contemplated the commercial delivery of goods to a customer and not the incidental carrying of packages in connection with one's business affairs).

Our Supreme Court in *Gross v. Kubel et al.,* 315 Pa. 396, 172 A. 649 (1934) affirmed the garnishee/insurer's disclaimer of liability under a policy of insurance which conditioned coverage on the automobile not being operated "for carrying passengers for hire" at the time of the accident.

At the moment of the accident in *Gross,* the insured/Kubel had four members of the basketball team traveling to a site to play a game. Occasionally in those instances when the school attended by Kubel and his teammates did not provide bus or rail travel to the games, cars owned by the players were used. The owner was reimbursed an amount equivalent to bus fares or compensated for the cost of oil and gasoline and given an additional sum for the use of the vehicle.

On the way to the game, a member of the team and a non-paying (non-team member) passenger were injured in an accident. They brought suit against Kubel and obtained judgment against him. The insurer denied liability under the policy's clause of negating coverage where the vehicle was used "for carrying passengers for hire." The conclusion that the injured plaintiffs were not entitled to sue the insured was noted by the *Gross* Court to be as follows:

"Under the facts, which are substantially undisputed, it is clear that the defendant was operating his car in the transportation of passengers for hire when the accident occurred. The arrangement for compensation under which he was carrying his passengers was *more than a mere reimbursement for the gas and oil used by all in common*

*on the trip. It went to the additional extent of compensating him for the use of the car. Had he been paid only a sum equivalent to the cost of the gas and oil used a serious question might have arisen as to whether such a payment would have constituted a carrying for hire. The additional sum paid to him, however, brings the operation of the car squarely within the clause of the policy. \* \* \*"*

... the garnishee had a complete defense to the attached execution, not only as to plaintiff Gross but also as to Miss Cromley, who was a guest in the car. Referring to the judgment secured by the latter, the trial judge correctly stated: "The fact, therefore, that this plaintiff was not herself a paying passenger cannot give her any rights against the garnishee, whose policy did not cover the accident in which she sustained her injuries."

315 Pa. at 399–400, 172 A. at 650 (Emphasis added).

The final case in this jurisdiction to address the passenger-for-consideration exclusion was *Orcutt v. Erie Indemnity Co.,* 114 Pa.Super. 493, 174 A. 625 (1934).

In *Orcutt,* a passenger injured in an insured's vehicle sought to recover judgment against the insurer, who disclaimed liability under a policy which provided "no liability is assumed on account of accidents occurring while the insured automobile is operated with the consent of the Insured \* \* \* for rental, hire or livery or carrying of passengers for a consideration." *Id.*

The facts and rationale for denying coverage in *Orcutt* consisted of the following:

On November 15, 1930, Melbourne Orcutt, the plaintiff, a painter, went to a feed store in the city of Sharon for the purpose of having the owner transport him, with some paint which he was about to use, to another point in that city. The owner of the store was busy, and could not accommodate the plaintiff, but Mendicino chanced to be present on some business, and, at the request of plaintiff, carried him as requested with his paint and some small articles. When they reached their destination, Orcutt asked Mendicino what the charges were, and, after some conversation, paid him 25 cents for the trip, and explained that he was going to

be busy only for an hour or two, and that he then desired Mendicino to haul him, with his ladders and paint, to another point. Mendicino gave Orcutt his telephone number and said if he needed him to call him up again. He did call, and *during the return trip,* and *while a passenger in the car, Orcutt suffered the injuries for which he recovered judgment. The compensation for the return trip was not actually paid.* The following question and answer by Mendicino bear directly upon the subject: "Q. State whether or not he made an arrangement with you whereby you would haul him and his ladders whenever he wanted you to? A. He was talking that way, but we didn't make no contract. I said *I couldn't be ready all the time for him,* because I have got something else to do. I said, '*Maybe, some time,* if you need any work, that's what I'm doing.'"

It is impossible to draw any other inference from this testimony than that *Mendicino was operating his car at the time of the accident for compensation or hire.* They were entire *strangers* to each other, *never having met* before, and there is *not a single circumstance from which an inference could be drawn that Mendicino or Orcutt contemplated that the work would be performed without charge.* Neither is there any significance in the *fact* that the compensation was not actually paid for the return trip.

114 Pa.Super. at 494–95, 174 A. at 626 (Emphasis added).

The result reached in other jurisdictions is varied and controlled by the facts of the individual case. See *Myers v. Ocean Accident & Guarantee Corp.,* 99 F.2d 485, 489 (4th Cir.1938). It appears, however, to be well settled that an occasional or incidental use of the insured vehicle to transport passengers will not avoid liability under an exclusion ("carrying a passenger for hire") clause, as such use has been interpreted to constitute no holding out for hire of the vehicle. See Anno., 30 A.L.R.2d 273, 277 at § 5 (1953).

From our survey of the applicable case law:

It is apparent that the authorities quite generally concede that money passing from the passenger [or third party] to the operator of a car, though associated with the carrying of

the passenger, may or may not be a consideration for such carrying, within the meaning of a provision such as we are considering[—"the carrying of persons for consideration"]. In making the distinction the courts take into consideration not alone the bare transaction but all its surrounding circumstances, including among other things the status and relations of the parties one to another, the existence or lack of common interest, pleasure or benefit in the making of the journey, and the relation of the amount of money to the actual costs of carrying.

*Myers,* supra, 99 F.2d at 493 (Citation omitted). Accord *State Farm Mut. Auto. Ins. Co. v. Self,* 93 F.2d 139, 140 (5th Cir.1937); *Ocean Accident & Guarantee Corp. v. Olson,* 87 F.2d 465, 467 (8th Cir.1937).

An extended analysis of the case law on this subject need not be undertaken. In light of the facts and of the decisions uncovered by our own research, we are constrained to reverse the judgment of the court below: The case before us is one in which the owner of the van had no knowledge of whether he would be reimbursed for operating expenses, contrast *Gross,* supra; *Orcutt,* supra; *Rykill,* supra; *State Compensation Ins. Fund et al. v. Bankers Indemnity Ins. Co.,* 106 F.2d 368 (9th Cir.1939); *Jensen v. Canadian Indemnity Co.,* 98 F.2d 469 (9th Cir.1938); there was no fixed amount to be paid prior to Cohen embarking on the journey, contrast *Gross,* supra; *Orcutt,* supra; *Martin v. Rivera,* 545 N.E.2d 32 (Ct.App.Ind. 1989); *Johnston v. Allstate Ins. Co.,* 505 So.2d 362 (Ala.1987); *State Farm Mut. Auto. Ins. Co. v. Self,* 93 F.2d 139, 140 (5th Cir.1937); *Ocean Accident & Guarantee Corp. v. Olson,* supra, 87 F.2d at 467; Cohen had no guarantee that he would be reimbursed for making the trip gratuitous at the outset, but remunerative at its completion; it was an isolated incident, contrast *Rykill,* supra; *American Lumbermen's Mut. Cas. Co. v. Wilcox,* 16 F.Supp. 799 (W.D.N.Y.1936); it was motivated by Cohen's friendship with and to do a favor for one of the three people (plus ice box) transported, see *Juszkiewicz v. N.J. Fidelity & P.G. Ins. Co.,* 210 App.Div. 675, 206 N.Y.S. 566 (1924); no clear evidence of an express or implied contract

that Cohen was to be compensated for transportation as a separate and distinct charge independent of the gasoline consumed, *Reed v. Bloom*, 15 F.Supp. 600 (W.D.Okla.1936); and, the evidence could be viewed (by the trier-of-fact) as a voluntary contribution or as a social amenity. Contrast *Jensen*, supra.

Accordingly, based on the particular facts recounted here, although there may be no genuine issue of material fact in dispute, Aetna is not entitled to the grant of its motion for summary judgment *as a matter of law.*

Judgment reversed; jurisdiction is relinquished.